503 S.E.2d 761

**REPUBLIC CONTRACTING CORPORATION, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT OF HIGHWAYS AND PUBLIC TRANSPORTATION, an Agency of the State of South Carolina, and Wilbur Smith & Associates, Inc., Respondents.**

No. 2864.

Court of Appeals of South Carolina.

Heard June 4, 1998.

Decided June 29, 1998.

Rehearing Denied Aug. 20, 1998.

Henry W. Brown, of Nexsen, Pruet, Jacobs, Pollard & Robinson, Charleston; and W. Henry Parkman, of Griffin, Cochrane & Marshall, Atlanta, GA, for appellant.

Charles E. Carpenter, Jr., Franklin J. Smith, Jr., and Nina Reid Mack, all of Richardson, Plowden, Carpenter & Robinson, Columbia, for Respondent SCDHPT.

Benjamin E. Nicholson, V, Charles Porter and Robert L. Widener, all of McNair Law Firm, Columbia for Respondent Wilbur Smith & Associates.

T.S. Stern, Jr., and Thomas E. Dudley, III, both of Covington, Patrick, Hagins, Stern & Lewis, Greenville, for Amicus Curiae Carolinas AGC.

Edwin Russell Jeter, of Jeter & Williams, Columbia, for Amicus Curiae Consulting Engineers of South Carolina.

GOOLSBY, Judge:

Republic Contracting Corporation (Republic) sued the South Carolina Department of Highways and Public Transportation (SCDHPT) and Wilbur Smith & Associates, Inc., (WSA) for damages resulting from allegedly defective construction plans for a bridge. This action involves breach of contract and breach of implied warranty claims. The trial court granted partial summary judgment to both defendants, holding Republic's claims were untimely. Republic appeals. We affirm in part, reverse in part, and remand.

## FACTS

Viewing the facts in the light most favorable to Republic, we find as follows: In 1976, SCDHPT contracted with WSA to design the James Island Expressway, a bridge to run from Charleston across the Ashley River to James Island. WSA designed the bridge in several segments. As required by statute, WSA placed its professional engineer's seal and endorsement on the plans.

On October 1, 1987, SCDHPT awarded Republic the contract to build the first part of the project in accordance with WSA's plans. The intended completion date was May 31,

1991. In addition to its role as designer, WSA served as the project engineer and supervised the construction.

Republic was to construct two sections of "mainline" expressway, plus three ramps to lead cars on and off the mainline. The mainline portion consisted of elevated concrete slabs supported by columns on concrete footings. The columns were to be capped with structures called "column capitals" flaring outward to help support the weight of the concrete slabs. On top of the column capitals Republic built hollow concrete boxes called "box girders." The box girders contained reinforcing steel, or "rebar," inside the concrete and flared structures called "blisters" that were designed to accommodate the stress of the post-tensioning system, that is, the network of anchors holding the box girders together.

WSA divided the mainline expressway and box girders into two separate parts. The two parts were to join at concrete joints, called "hinges," with huge amounts of rebar inside. The hinges were designed to allow for thermal expansion and contraction of the two separate parts.

The phase of the bridge that Republic was to construct contained nine hinges. The contract required Republic to subcontract a certain amount of the work to disadvantaged business enterprises. Republic initially hired one such enterprise, Performance Steel Erectors, as its rebar subcontractor.

Republic began work on January 28, 1988. Early in the project, however, Performance Steel experienced problems in installing the rebar in the hinges, column capitals, and blisters. The problems caused delays and cost overruns.

On September 19, 1989, Performance Steel wrote a letter to Republic's project manager, John Brodie, identifying three factors that caused the delays in installing the rebar. As evident in the following excerpts from the letter, Performance Steel attributed two of the problems to faulty work by WSA.

B. The bridge drawings are a very poor set of drawings to have to work with. They are complicated and put together in a confusing way. The main problems are basically on the lay out of the Blisters and Hinges on the box spans. They fail to give clear detail of dimensions, spacing, and clearances. There needs to be better detail sheets!!

C. There is also a problem with the Engineers from [WSA] agreeing with each other on what the blueprints show. They are always making continuous changes due to the unclearness of the bridge drawings.

Republic passed these complaints by Performance Steel on to WSA and SCDHPT; however, both WSA and SCDHPT denied the problems resulted from design flaws. Instead, WSA vigorously contended Performance Steel was incompetent and the manufacturer's fabrication of the rebar did not meet industry standards. To solve some of the problems, WSA agreed to issue large-scale views of existing drawings and to have the resident engineer meet with Republic and Performance Steel before the construction of each new blister or hinge. In addition, SCDHPT agreed to several contract modifications concerning relatively minor matters.

Performance Steel wrote to Republic again on March 7, 1990, about its concerns with the plans. In its letter, Performance Steel stated it considered a major contributing factor to the delays to be "the bridge plans being draw [sic] in such a manner that there was a lot of confused interpretation by everyone." Despite Performance Steel's complaints, Republic continued to believe Performance Steel was at fault and did not investigate the possibility of filing a claim against either WSA or SCDHPT. Instead, on June 25, 1990, Republic, with the concurrence of both WSA and SCDHPT, terminated Performance Steel and then assumed the work until it could hire another subcontractor.

Republic then contracted with Locklear Brothers, another disadvantaged business enterprise. Locklear quit the job after two days complaining it was "too complicated." After obtaining the permission from SCDHPT to perform the work itself, Republic then used its own crew to finish installing the rebar.

Performance Steel had completed two hinges and was working on the third when Republic canceled its subcontract. Republic began installing the rebar for the fourth hinge in December 1990. This hinge was the first hinge that Republic had worked on from start to finish without a rebar subcontractor.

It was during the construction of the fourth hinge that Republic, the record suggests, realized for the first time that the difficulties in the installation of the rebar resulted from problems with WSA's design. As Brodie, Republic's project manager, stated in his affidavit:

> [The fourth hinge] was an eye opener for Republic. For the first time in the Project, there was no Performance Steel to blame for rebar placement problems, and Republic had taken steps to ensure fabrication was not a problem. But instead of smooth sailing, Republic's own workers encountered enormous problems trying to install the steel. Essentially, they found it was like trying to put 10 pounds of steel into an 8 pound box. It just would not all fit, at least not without incredible amounts of bending, forcing and cramming. Republic had to use hammers and wrecking bars to force the steel in, which is not at all typical of this type of work. Republic began to realize for the first time that the problems with the hinges may not really have been due to Performance Steel or fabrication, as [WSA] had always maintained, but may have been actually due to the design by WSA. WSA's inspectors made things worse, by insisting that every bit of the steel be crammed into place, no matter what the conflicts.

The concrete for the fourth hinge was poured on April 22, 1991. Because the concrete could not be poured until the rebar was in place, Republic had to have completed the rebar work and had the hinge inspected and approved by the WSA before this date.

The difficulties Republic encountered led to another meeting on April 26, 1991, with representatives of WSA and SCDHPT. At this meeting, WSA admitted to design problems and attempted to rectify them by making certain changes. Republic claims WSA's admission at this meeting was its first notice of a potential claim against either WSA or SCDHPT.

In a letter dated July 19, 1991, Republic gave notice to SCDHPT of its intention to assert a claim for "delays and added costs caused by details in the contract drawings that are not constructable without modifications or changes." SCDHPT acknowledged Republic's claim and instructed Re-

public to keep certain cost records for later processing of the claim.

SCDHPT extended the completion date of the contract to May 17, 1992; however, Republic did not complete the project until August 29, 1992. After Republic concluded its work, SCDHPT assessed liquidated damages of about $153,000 against Republic based on its position that Republic was 102 days late in finishing the work. Republic submitted the final contract closeout documents to SCDHPT on July 26, 1994.

On April 25, 1994, Republic filed suit against both SCDHPT and WSA. The trial court granted partial summary judgment to both WSA and SCDHPT based on its determination that Republic knew or should have known of its claims no later than April 22, 1991, when the concrete was poured for the fourth hinge.[1]

## DISCUSSION

### I. The Applicable Statute of Limitations

Republic asserts the trial court erred in not applying S.C.Code Ann. § 15–3–520(b) (Supp.1997), which provides a twenty-year limitations period for "an action upon a sealed instrument." We disagree and affirm the trial court's decision to apply S.C.Code Ann. § 15–3–530(1) (Supp.1997), which provides a three-year statute of limitations.

Republic argues WSA's bridge plans are sealed instruments because WSA placed its professional engineer seal and endorsement on the plans pursuant to statutory requirement. *See* S.C.Code Ann. § 40–22–370(3), (4), and (6) (Supp.1997) (formerly codified as S.C.Code Ann. § 40–21–320 (1986)) (requiring plans prepared by a registered engineer to include the engineer's seal and endorsement when filed with public authorities and when issued for use as job site record documents). Nothing in the text of this section, however, leads to

---

1. The trial court gave Republic 30 days "to amend its discovery responses to clearly describe the nature and extent of any post-April 25, 1991 claims...." The trial court further stated that if Republic failed to do as directed, partial summary judgment would be converted to full summary judgment as to both defendants with the exception of Republic's claim that SCDHPT was equitably estopped to assert the statute of limitations.

the inference that a purpose of the mandate for affixing a seal and an endorsement is to extend the time in which an action can be brought concerning a document on which these items appear. *See Landmark Eng'g, Inc. v. Cooper*, 222 Ga.App. 752, 476 S.E.2d 63 (1996) (holding that a statute requiring the stamp of a registered surveyor on certain documents ensures only that the surveyor takes responsibility for the work but does not allow a plaintiff to bring an action within the limitations period prescribed for documents under seal); *County Sch. Bd. of Fairfax County v. M.L. Whitlow, Inc.*, 223 Va. 157, 286 S.E.2d 230, 232 (1982) ("The impression of a corporate seal on a document, without more, does not create a sealed instrument."). Furthermore, nothing in the plans themselves suggest that WSA affixed its seal and endorsement for any other purpose than to comply with the applicable licensing statutes. We have no reason, therefore, to believe the parties intended the plans to have the effect of a sealed instrument. *See Square D Co. v. C.J. Kern Contractors, Inc.*, 314 N.C. 423, 334 S.E.2d 63 (1985) (holding the impression of a corporate seal on a construction contract did not transform it into a contract under seal in the absence of language in the body of the contract creating a sealed instrument).

■ Republic concedes neither its seal nor that of SCDHPT appears on the signature page of the construction contract, but maintains the contract should be given the effect of a sealed instrument because it incorporates by reference other documents under seal. Republic, however, did not argue to the trial court either in its memorandum in opposition to the summary judgment motions or at the hearing that the twenty-year statute of limitations should apply to its claims against SCDHPT. Because Republic failed to raise this issue to the trial court, it has failed to preserve it for our review. *See Hendrix v. Eastern Distribution, Inc.*, 320 S.C. 218, 464 S.E.2d 112 (1995) (vacating an opinion by the court of appeals to the extent it addressed an issue not preserved for review); *Noisette v.. Ismail*, 304 S.C. 56, 403 S.E.2d 122 (1991) (holding an issue is not properly before the court of appeals if the trial court does not explicitly rule on it and the appellant fails to make a motion under Rule 59(e), SCRCP, to amend or alter the judgment on that ground).

## II.   Republic's Claim Against WSA

■   In its complaint, Republic alleged WSA "breached its implied warranty of workmanship and its implied warranty of the sufficiency of the plans and specifications for their intended use."   Republic contends it could not have discovered its claim against WSA until the meeting on April 26, 1991, when WSA admitted the defects in the plans.   Based on this premise, Republic further argues the filing of its lawsuit on April 25, 1994, was within the three-year statute of limitations.   We disagree.

■   The discovery rule applies to Republic's action against WSA.   *See Santee Portland Cement Co. v. Daniel Int'l Corp.*, 299 S.C. 269, 384 S.E.2d 693 (1989) (holding the discovery rule applies to breach of contract actions); *overruled on other grounds by Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors Division of Unidynamics Corp.*, 319 S.C. 556, 462 S.E.2d 858 (1995); *Mills v. Killian*, 273 S.C. 66, 254 S.E.2d 556 (1979) (holding the discovery rule applies to professional negligence causes of action).   The statute of limitations, therefore, runs from the date the injury is discoverable by the exercise of reasonable diligence.   *Graniteville Co., Inc. v. IH Servs., Inc.*, 316 S.C. 146, 447 S.E.2d 226 (Ct.App.1994).   An injured party must act promptly when the facts and circumstances of the injury would place a reasonable person on notice that a claim against another party might exist.   *Dean v. Ruscon Corp.*, 321 S.C. 360, 468 S.E.2d 645 (1996).   The test of whether a person should have known the operative facts is objective, rather than subjective.   *Berry v. McLeod*, 328 S.C. 435, 492 S.E.2d 794 (Ct.App.1997).   That an injured party may not comprehend the extent of the injuries is immaterial.   *Dillon County Sch. Dist. No. Two v. Lewis Sheet Metal Works, Inc.*, 286 S.C. 207, 332 S.E.2d 555 (Ct.App.1985), *cert. granted*, 287 S.C. 234, 337 S.E.2d 697 (1985), *and cert. dismissed*, 288 S.C. 468, 343 S.E.2d 613 (1986).

The critical inquiry, then, is whether Republic could have discovered its claim against WSA before April 25, 1991.   The trial court held the latest possible date on which the statute of limitations could have begun to run was April 22, 1991, when the concrete was poured for the fourth hinge.   We agree.

From the beginning, the project was plagued by numerous difficulties; however, WSA blamed the installation problems on the subcontractor and the manufacturer and refused to admit its drawings were defective. Viewing the evidence in the light most favorable to Republic, we agree with the trial court that even if Republic reasonably relied on WSA's assurances while subcontractors were installing the rebar, Republic had the opportunity to observe firsthand the effects of the design flaws once it assumed full responsibility for the rebar and began constructing the fourth hinge. Because the concrete for that hinge was poured on April 22, 1991, Republic had to have finished installing the rebar for that hinge by that date. As Brodie states in his affidavit, it was during the months preceding this date that Republic realized it could not blame either the subcontractor or the manufacturer for the problems in installing the rebar. Republic, then, having already completed the task it maintains was made unduly difficult because of faulty design work by WSA, had sufficient information no later than April 22, 1991, to put it on inquiry notice, which, if developed, would have revealed the defects in WSA's work. *See Tanyel v. Osborne,* 312 S.C. 473, 441 S.E.2d 329 (Ct.App.1994) (holding in a case brought under the South Carolina Tort Claims Act case that the two-year statute of limitations began to run when the plaintiff witnessed the events causing his loss, and the plaintiff's inability, despite diligent investigation, to discover evidence of culpability against a particular defendant within the limitations period is irrelevant).

Republic further contends that because it did not have the expertise to determine whether WSA's work was defective, the earliest it can be charged with this knowledge is April 26, 1991, when WSA acknowledged the hinges were improperly designed. Republic further argues that whether it should have consulted an expert before that date was a question of fact to be developed at trial. We disagree.

■ The statute of limitations begins to run when a plaintiff knows or should know of a potential claim against another party, not when the plaintiff develops a full-blown theory of recovery. *Christensen v. Mikell,* 324 S.C. 70, 476 S.E.2d 692 (1996). *See also Berry v. McLeod,* 328 S.C. at 445, 492 S.E.2d at 799 (stating that in applying the discovery rule to a fraud

case, the focus is on whether the complaining party acquired knowledge of existing facts sufficient to put that party on notice of the alleged fraud).

In support of its arguments, Republic cites *Dean v. Ruscon Corp.*, 321 S.C. 360, 468 S.E.2d 645 (1996) and *Graniteville Co. v. IH Servs., Inc.*, 316 S.C. 146, 447 S.E.2d 226 (Ct.App.1994) for the proposition that a cause of action requiring expert testimony does not accrue until the plaintiff has the opportunity to confer with an expert.[2]  In our view, however, neither case supports Republic's arguments.

In *Dean,* there was no dispute that the plaintiff had acted promptly in hiring consultants to examine the damage allegedly caused by the defendant.  The question was not whether the statute of limitations should have been tolled until the plaintiff sought expert advice, but rather, whether the experts' advice, as well as the plaintiff's own beliefs, was sufficient to trigger the running of the statute when the experts were hired.

In *Graniteville,* this court held the plaintiff's employment of an expert eight days after the occurrence giving rise to its cause of action was sufficient evidence of reasonable diligence to withstand the defendant's summary judgment motion.  In support of our holding, we stated, "We can find nothing in the record to suggest that Graniteville should have suspected negligence on the part of IH Services prior to determining the cause of the fire."  *Graniteville,* 316 S.C. at 148, 447 S.E.2d at 228.

Here, in contrast, the record has ample evidence, including the complaints from Performance Steel and Republic's own observations, to prompt Republic to investigate a possible claim against WSA.  Moreover, whereas in *Graniteville* the plaintiff needed to determine whether its injury resulted from the wrongdoing of another party as opposed to an accident or an act of God, Republic knew or should have known the problems in installing the rebar were attributable to someone else's malfeasance and needed only to identify the culpable party. *See Wiggins v. Edwards,* 314 S.C. 126, 442 S.E.2d 169

---

2.  Republic concedes it did not engage an expert to determine WSA's fault in the project, but argues the need to do so was obviated by WSA's admission at the meeting on April 26, 1991.

(1994) (holding that under the discovery rule, the important date is the date of discovery of the injury, not the date of discovery of the wrongdoer).

### III.  Estoppel

The trial court held further inquiry into the facts was appropriate to clarify the application of the law of equitable estoppel to the timeliness of Republic's suit against SCDHPT, but refused to allow Republic to assert this argument against WSA.  Republic argues the trial court incorrectly held (1) it failed to preserve the issue for trial and (2) it failed to present any genuine issues of material fact showing WSA should be estopped from asserting the statute of limitations defense. We agree with Republic that the trial court erred in holding it failed to preserve the issue; however, we agree with the trial court that Republic did not present any genuine issues of material fact on the question.

■ The trial court stated that because Republic did not plead estoppel in a reply to WSA's statute of limitations defense, it could not rely on this ground to avoid the defense. We disagree.  Under Rules 7(a) and 8(c), SCRCP, a party has the option to reply to an affirmative defense, but is not required to do so absent a court order.  Although Rule 8(c) requires a party to set forth affirmative defenses to a "preceding pleading," this requirement applies only if the party actually pleads responsively to the prior pleading.  Here, Republic would have been required to plead estoppel only if it had voluntarily replied to WSA's answer or if the trial court had ordered it to file a reply.  Republic, however, did not file a responsive pleading, and the trial court never ordered it to do so.  *See Citizens & S. Nat'l Bank of S.C. v. Construction Enters., Inc. of TN,* 309 S.C. 500, 424 S.E.2d 530 (Ct.App.1992) (holding that when an answer asserts affirmative defenses, these defenses are deemed denied or avoided by the party against whom they are asserted unless the court requires that party to file a reply or the party voluntarily does so); *cf.* 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure,* § 1186 (2d ed. 1990) (stating a party asserting an affirmative defense can seek a court-ordered reply if the defense is of such magnitude that it can affect the outcome of the trial or greatly broaden the issues).

■ We nevertheless hold the trial court properly granted summary judgment to WSA on the issue of estoppel.

■ A defendant is estopped to assert the statute of limitations defense against a plaintiff's claim if the defendant's conduct has induced the delay that otherwise would give operation to the statute. *Dillon County Sch. Dist. No. Two v. Lewis Sheet Metal Works, Inc.*, 286 S.C. at 218, 332 S.E.2d at 561. The conduct may involve inducing the plaintiff either to believe that an amicable adjustment of the claim will be made without suit or to otherwise forbear exercising the right to sue. *Id.* at 218, 332 S.E.2d at 561.

Republic recites numerous allegations suggesting a "cover-up" by WSA through its attempt to shift the blame for the construction difficulties to the subcontractors and the manufacturer. These allegations, if true, at most show WSA, in refusing to admit the design flaws, prevented Republic from investigating and recognizing its claim. They do not support the proposition that WSA "lulled [Republic] into a sense of security, preventing [it] from filing suit before the running of the statute [of limitations]." *Lovell v. C.A. Timbes, Inc.*, 263 S.C. 384, 390, 210 S.E.2d 610, 612 (1974). *See also Black v. Lexington Sch. Dist. No. 2*, 327 S.C. at 65, 488 S.E.2d at 332 (stating the defendant's refusal to accept liability further weakened unimpressive evidence of estoppel).

### IV. Republic's Claim Against SCDHPT

■ In its claim for breach of contract against SCDHPT, Republic alleged SCDHPT provided it with "[d]efective contract documents," failed to grant time extensions and additional compensation to which Republic was entitled, and failed to pay contract funds due. Republic argued to the trial court its claims against SCDHPT did not accrue until SCDHPT "failed to cure its breach through the remedies provided in the contract." The trial court dismissed this argument, relying on *Grooms v. Medical Soc'y of S.C.*, 298 S.C. 399, 380 S.E.2d 855 (Ct.App.1989) for the proposition that a claim for damages accrues the moment a defendant breaches a duty owed to a plaintiff.

Republic challenges this ruling by arguing (1) its claim against SCDHPT could not have accrued before August 29,

1991, when it had substantially completed the project, and (2) because of the various remedies provided by the contract itself for resolving certain disputes during the life of the project, a breach of that contract could not have occurred until the final accounting and failure of the contractual remedies. Although we decline to determine exactly when Republic's claim against SCDHPT accrued, we hold that the trial court erred in holding as a matter of law that it was untimely because of Republic's failure to sue before April 21, 1994.

In cases involving construction contracts, the statute of limitations generally begins to run when the work is completed. 54 C.J.S. *Limitations of Actions* § 131, at 175 (1987). Only in rare circumstances does it run against a contractor's claim for payment before completion of the contract. *Id.*

■ The supreme court extended the discovery rule to contract claims. *Santee Portland Cement v. Daniel Int'l Corp.*, 299 S.C. at 271, 384 S.E.2d at 694. Relying on *Gattis v. Chavez*, 413 F.Supp. 33 (D.S.C.1976), the supreme court further stated that a statute of limitations should be construed in a manner consistent with its underlying purpose and the requirement of substantial justice for all parties involved. *Santee*, 299 S.C. at 271, 384 S.E.2d at 694. Although the policy behind a statute of limitations is to protect defendants from false claims that might be difficult to disprove if brought after the loss of relevant evidence, this concern must be balanced against the need to protect plaintiffs from suffering when circumstances prevent them from knowing they have been harmed. *Id.* at 271, 384 S.E.2d at 694. Given this reasoning, we conclude the discovery rule was intended only to expand the applicable limitations period so as not to allow the operation of an arbitrary accrual date to prevent a deserving claimant from pursuing legal recourse. Moreover, it would undermine public policy to apply the rule to cut short the normal running of the statute of limitations. Our interpretation of the policy behind the discovery rule is consistent with cases from other jurisdictions holding actions on construction contracts were held to have accrued only upon completion or substantial completion of performance. *See, e.g., Millgard Corp. v. McKee/Mays*, 831 F.2d 88 (5th Cir.1987) (holding that a subcontractor's breach of contract action against a contractor did not accrue while the parties were continuing to act

under the express provisions of the contract on the subcontractor's claim for additional compensation), *reh'g denied,* 835 F.2d 288 (5th Cir.1987); *Pioneer Roofing Co. v. Mardian Constr. Co.,* 152 Ariz. 455, 733 P.2d 652 (Ct.App.1986) (holding that a claim pursuant to an indivisible construction contract for work, labor, or material performed or furnished is treated as a demand on the entire contract and the statute of limitations will not begin to run until the contract has been finished); *Santucci Constr. Co. v. City of Danville,* 128 Ill.App.3d 954, 84 Ill.Dec. 234, 471 N.E.2d 1000 (1984) (allowing a contractor to maintain an action for work contemplated by the contract when suit was filed within the applicable limitations period from the date the entire contract was completed); *Edward Kraemer & Sons, Inc. v. City of Overland Park,* 19 Kan.App.2d 1087, 880 P.2d 789 (1994) (holding a contractor's action for incentive payments under a construction contract arose upon completion of the work and the city's refusal to pay the claim); *Zook Bros. Constr. Co. v. State of Montana,* 171 Mont. 64, 556 P.2d 911 (1976) (stating a contractor's action against the state for breach of a highway construction contract arises when the state submits the final estimate to the contractor); *Hubble v. Lone Star Contracting Corp.,* 883 S.W.2d 379 (Tex.App.1994) (holding the statute of limitations begins to run on a continuing contract at the earliest of the following: (1) when the work is completed, (2) when the contract is terminated pursuant to its terms, or (3) when the contract is anticipatorily repudiated by one party and the repudiation is adopted by the other party), *writ denied* (Feb. 2, 1995).

The contract between SCDHPT and Republic incorporated SCDHPT's 1986 Standard Specifications for Highway Construction. These specifications contain a number of provisions indicating the understanding that disputes survive beyond project completion. For example, Subsection 105.16 of the Specifications, which concerns claims for adjustment and disputes, provides that "[i]f the claim, after consideration by the Engineer, is found to be just, it will be paid as extra work as provided herein ... or by supplemental agreement." Republic submitted its claim according to this procedure; however, it never received a response or payment. In view of the requirement that a claim must be "found to be just" before an adjustment for additional compensation is made, a contractor

could not sue until either the claim was rejected or the final payment became due.

Here, we cannot say as a matter of law that Republic's grievances against SCDHPT were actionable while claims concerning those grievances were still pending pursuant to contract procedure. SCDHPT did not assess liquidated damages against Republic until after Republic completed the project. In addition, Republic never received a formal rejection of its claim, and the final payment was not made until less than one year before the lawsuit was filed. Summary judgment on Republic's claim against SCDHPT was therefore premature.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

HOWELL, C.J., and CURETON, J., concur.