**ASHLEY RIVER INDUSTRIES, INC; and Coastal Marine Enterprises, Inc. d/b/a Dolphin Cove Marina, Plaintiffs,**

**v.**

**MOBIL OIL CORPORATION; Mobil Chemical Company; and Mobil Corporation, Defendants.**

No. CIV. A. 2:98–2964–12.

United States District Court, D. South Carolina, Charleston Division.

Aug. 8, 2000.

Lemuel Gray Geddie, Jr., Nancy W. Monts, Edward Grantland Burns, Ogletree Deakins Nash Smoak and Stewart, Greenville, SC, for Ashley River Industries Inc, Coastal Marine Enterprises Inc dba Dolphin Cove Marina, plaintiffs.

Jane Thompson Davis, Nelson Mullins Riley and Scarborough, Charleston, SC, David Craig Landin, Lori Elliott Guzman, Turner A Broughton, Hunton and Williams, Richmond, VA, for Mobil Oil Corporation, Mobil Chemical Compa, Mobil Corporation, defendants.

### ORDER

HOUCK, Chief Judge.

This action was brought by Ashley River Industries ("ARI") and Coastal Marine Enterprises ("CME") (collectively "plaintiffs") against Mobil Oil Corporation, Mobil Chemical Company and Mobil Corporation (collectively "Mobil" or "defendants"), alleging fraud, negligence, negligence per se, money had and received, nuisance, and seeking a declaration of responsibility. At issue is the lead and arsenic contamination of 9.65 acres of industrial property located on the Ashley River in "the neck" area of North Charleston, South Carolina. The matter is currently before the Court upon the defendants' motion for summary judgment. For the reasons that follow, the Court grants the motion.

### Facts

*A. History of the Property in Question*

A brief history of the property and its uses is necessary in order to address the issues presented. The area known as "the

neck" has seen industry since the mid–1800s. Virginia–Carolina Chemical Corporation ("VCC") built a chemical production plant there around 1870. On the specific plot in question, VCC produced fertilizers, made primarily from sulfuric acid, which was created from individual components on the site. Lead and arsenic are by-products of the production of sulfuric acid. VCC conducted this process continually until 1963, when it merged with Socony Mobil Oil Company, which changed its name to Mobil Oil Corporation in 1966.

Mobil Chemical Company, a division of Mobil Oil Corporation, thereafter conducted operations on the site in question. The Chicora Acid Plant, as it was now called, produced sulfuric acid both for fertilizer production and for use in the Mobil Chemical plant, located north of the instant property. Sulfuric acid was shipped to Mobil Chemical via a pipeline. This process continued until 1969, when Mobil sold its fertilizer production and leveled the Acid Plant to its foundations.[1]

Mobil Oil offered its excess land for sale in 1972. In November of that year, Mobil entered into a sales agreement with Consolidated Services, Inc. (now known as Ashley River Industries ("ARI")) for the purchase of 9.65 acres of this land. After extensive negotiations, the land was purchased by ARI on February 6, 1973.

## B. The Marina and Campground

■ CME and ARI are each owned in part by David Race, who is the president of both companies. ARI's initial business on the property was in the nature of electronics and ship repair. However, in about 1985 ARI and CME began the process of obtaining permits to construct a marina and RV park/campground on the property.[2] The permits consisted of a water quality certification from the South Carolina Department of Health and Environmental Control ("DHEC") Division of Water for the marina, and construction authorization from the DHEC Bureau of Solid & Hazardous Waste Management ("Bureau") for the park/campground. A series of correspondence ensued between DHEC and the plaintiffs, the details of which are important to this discussion.[3]

### 1. Letter of July 18, 1985

On July 18, 1985, the manager of DHEC's Impact Analysis and Standards

---

1. Defendant Mobil Corporation was formed as a holding company in 1976, and made Mobil Oil Corporation a wholly-owned subsidiary.

2. ARI acted as the property owner, from which CME leased the property to construct the marina/campground.

3. When ruling on a motion for summary judgment, the court is to construe the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, this does not mean that the court must ignore facts not mentioned by the non-moving party. Here, the plaintiffs in their statement of facts mention only that they applied for a permit to build the marina; they make no mention of the attempt to obtain a permit for the park/campground or of the specific details of the DHEC correspondence regarding potential contamination, as discussed hereafter.

The plaintiffs have not objected to the documents and correspondence attached to the defendants' briefs, and the Court therefore assumes that there is no question as to their validity or authenticity. Neither do the plaintiffs raise any genuine issue of material fact regarding the contents of said correspondence. Because the DHEC correspondence and actions taken in response thereto are material to the discussion on the instant motion, the Court will note the factual events as outlined by the defendants and as supported by the affidavits and exhibits, and will construe any reasonable inferences therefrom in the plaintiffs' favor.

Section wrote a letter to the U.S. Army Corps of Engineers' Charleston District Engineer regarding the plaintiffs' water quality certification. A copy of this letter was sent to CME as the permit applicant. This letter indicates that the certification would be deferred, in part due to the possibility of hazardous materials on CME's proposed marina site:

> First, much of the area adjacent to the marina site has been used for many years as a site for heavy industry. Unknown quantities of potentially hazardous materials have been dumped in the marshes adjacent to the Ashley River in the general area of the proposed marina. Recent maintenance dredging ... in an old barge slip upstream of the site uncovered a lens of contaminated soil that had to be removed to high ground and/or isolated by covering with clay......... Sampling in the small creek adjacent to the marina site is complete; however, analysis of the samples will not be completed until late fall. Discussions with field personnel indicate that conditions at the site are uncharacteristic of a natural marsh. The odor, soil characteristics and the ability of the disturbed sediments to create a sheen upon the water indicate a high potential for contamination.
>
> Construction activities in the marsh ... may disturb contaminated sediment and cause adverse water quality problems. Also, upland construction may result in exposure of contaminated soils and water quality problems due to run-

off. For these reasons, we will defer action on certification until after sampling results have been received.[4]

### 2. Letters of September 4, 1985

On September 4, 1985, the same Impact Analysis manager wrote two letters directly to CME regarding its requests for permits. The first indicates that certification for the marina was granted on several conditions, "depending on sampling results." It specifically states in part that "Due to potentially contaminated sediments in the small creek adjacent to the downstream side of the property ... no work is to be done on the proposed boat rental pier until the results of sampling conducted in June of 1985 are available and written authorization to proceed with the work is provided to the applicant by this office."

The second letter, sent to Henry McCaughey of CME, is more specific in regards to potential contamination. It reads in relevant part as follows:

> [DHEC grants your water quality certification for your proposed marina subject to certain conditions, to which you have agreed].
>
> Throughout our discussions with you, we have expressed concerns over location of a recreational facility in an area potentially contaminated with hazardous material. These concerns include:
>
> 1. Potentially contaminated sediments in the marsh adjacent to the site; and

---

**4.** The other concern DHEC had about the site was that it would "draw potentially large numbers of people into an area that has historically been used and is being used for heavy industry," a sentiment shared in objection letters by Albright & Wilson, Inc. (which purchased the former Mobil Chemical plant north of the site in 1984) and South Carolina Electric & Gas, another neighboring land- owner. The DHEC letter further notes that, because the area is used for heavy industry, "the State of South Carolina is currently investigating sites on this list for the presence of hazardous waste and environmental contamination," and that it "should defer approval of the project until we know the area is safe for its intended use."

2. Potentially hazardous waste located on property adjacent to your site.

Additional concerns voiced during meetings and telephone conversations with you, include the potential for hazardous wastes in soil on your site and the increased potential for body contact recreation in the Ashley River, which is not classified or protected for swimming.

Our general concerns cannot directly be addressed through the [certification] process due to the scope of that review process. However, we feel that we must advise you of our concerns and recommend that you take certain actions to ensure that the site is safe for your intended use. We recommend that you do the following:

1. Have chemical testing conducted on the soil from several locations on your site.... Department personnel would be happy to work with you to design a sampling program....;

2. Defer operation of the facility pending results of planned studies concerning materials on property adjacent to your site;

3. Defer operation of the facility pending results of sampling in the tidal creek adjacent to the proposed campground.

.... We urge that you consider these comments carefully and take all actions necessary to ensure that your project provides safe, healthful recreation for your marina and campground patrons.

### 3. Letter of September 6, 1985

Two days later, on September 6, 1985, Henry McCaughey wrote a letter to Mobil Foundation, Inc. on CME stationery concerning DHEC's letters. Though lengthy, the letter's contents are relevant to the motion for summary judgment.

Dear Sir,

Please find enclosed a copy of the letter from DHEC dated September 4, 1985 which raises serious questions about contamination and hazardous waste in and around the property I have leased.

As the current leaseholder and developer of the [forthcoming marina and RV park], I am very concerned with the recent communication with DHEC. Specifically, the potential threat of condemnation of our development due to hazardous waste both in the adjacent marsh and on the highground.

.... Mobil Oil Corporation, as prior owner and conveyor of this property to my landlord, must accept responsibility for these conditions which resulted from industrial activity on this and the adjacent property.

You [have stated] that public interest demands satisfactory assurances and safeguards to protect the adjacent marsh and tidal waters. It is gratifying to know that an organization which may have created another "love canal" [5] condition has the compassion to worry about the public and is interested in providing safeguards to assure no further degredation [sic] to the environment occurs.

The DHEC letter enclosed points out many concerns about possible contamination and hazardous waste, which, if verified, places Mobil Chemical in jeopardy of hundreds of millions of dollars in law suits from present/previous companies and their employees at this site as well as those residents living in the surrounding areas.

---

5. This comment suggests that the land is as contaminated as the "Love Canal" area of western New York, a now-famous site of toxic contamination which was the focus of nation attention in the late 1970s and early 1980s.

One can only speculate on the ramifications of an environmental clean-up of this magnitude, i.e., The Ashley River estuarine system, Baker Hospital Complex, and adjacent residential community in the event this becomes public or a political/media football.

The impact of the DHEC disclosure has been dramatic, particularly with respect to the permitting process. I have been actively pursuing my RV park and marina project for almost a year. Because of its strong profit potential, public need, and enjoyable working surroundings, I intend to complete this project.

In the event that we elect to continue the development without the clean-up, and at some later date it is found that toxic waste is endangering public safety, I would have no alternative than to bring suit against Mobil Corporation as the ultimate defendant. Unfortunately, at that point, there would be no winners.

. . .

At the present time nothing is confirmed; however, in a worse [sic] case scenario, Coastal Marine Enterprises could use it's [sic] permits and waterfront access to discretely remove all contaminated and hazardous waste to a proper disposal site and bring in clay and top soil to provide a safe landscaped parcel of land.

You understand of course that Mobil will pay for this entire project. and I fully expect that the cost would exceed 3—5 million dollars, depending on the degree and type of the contamination.

In conclusion, it is the intent of this letter to provide you the opportunity to correct the condition Mobil willfully created. In view of Mobil's responsibility with regard to these potentially hazardous conditions and their direct impact on my future, I feel that it is imperative that we have a joint meeting at the development site to discuss the means of resolving these conditions.

### 4. Letter of October 30, 1985

A meeting was held between members of the Bureau of Solid & Hazardous Waste Management and Henry McCaughey of CME on October 29, 1985. The follow-up letter of the next day indicates that the Bureau informed CME that due to a "full schedule," it could not commence testing any sooner than December 1985. As a result, the Bureau recommended that CME "obtain a consultant to take environmental samples of your property in a manner that would provide the Department reasonable assurance of the environmental status of your site."

The letter also outlined sampling parameters to be followed to ensure that the sampling would be proper. The letter noted that the parameters set forth were "the minimum parameters necessary for the Department to make a judgment with reasonable assurance to the health and safety of both the environment and the populace of this area." Before the sampling took place, the Bureau also asked CME to submit a "work plan" containing "information regarding the certification of the laboratory to be responsible for the analysis of the samples, a sampling scheme, sampling locations . . . along with the sampling protocol and chain of custody procedures."

### 5. Letters of November 15 and December 6, 1985

David Race, part-owner of both ARI and CME, hired Carolina Engineering Design Corporation ("Carolina Engineering") to perform the analysis recommended by the Bureau. Carolina Engineering sent its samples to General Engineering Laboratory ("GEL") for analysis. Carolina Engineering set forth its results and proce-

dures in a letter to Race dated November 15, 1985, concluding that "all levels of organic compounds are below those detectable by EPA measuring standards and practice." The letter opines that "it is clearly evident from the analysis results obtained from GEL, that no organic compound or metal exceed [sic] minimum EPA standards." The letter notes that one standard of contamination was not obtainable at that time. By letter dated December 6, 1985, Carolina Engineering reported that the missing reference standard had been met, and made the "considered opinion that no hazardous contamination exists on [the] property."

At deposition for this case, David Race testified that Carolina Engineering, no longer a viable entity, was set up by Race and another individual and given to Race's son and daughter "to do something with." Carolina Engineering's Quality Assurance Manager, who oversaw the taking of the samples, testified that he had never done environmental sampling before the CME site, and that he had never since undertaken such a task.

### 6. Article of November 19, 1985

On November 19, 1985, the Charleston *Post–Courier* newspaper ran an article entitled "Developer Keeps Sights Set On Campsite And Marina." In the article, Wayne Fanning of DHEC is quoted as saying "I wouldn't want to camp there," and the article connects this statement with "the possibility that the land may be tainted with hazardous wastes from when it was used as a fertilizer plant." At that time, the article continued, "there is only a suspicion of toxic wastes on the site." The article attributes Henry McCaughey of CME as saying that independent tests found no toxic wastes on the site, but that the city building inspector continued to refuse issuing a permit for the site, "citing questions about the environmental safety of the site" and its "incompatib[ility] with industrial property surrounding it."

### 7. Letter of December 13, 1985

The Bureau received a copy of the Carolina Engineering/GEL sampling report, and commented thereupon in a letter to Race and ARI dated December 13, 1985. It states that, upon review of the results, "it became obvious that there were several deficiencies that have limited our complete review of the referenced [results]." Noting the previously outlined work·plan, the Bureau stated that all samples appeared to have been properly taken, but that "only one analysis was made on a composite of all seven sampling stations. This leaves us with an inadequate variety of data for discrete areas of the property."

The problem, the Bureau pointed out, was that there was no control sample from which it could judge the results of the analysis, and further that the composited samples could result in "dilution" of hazardous contents. Thus, "should only one of the portions of one of the initially composited samples be contaminated ... with relatively high levels of hazardous or toxic substances[,] a quantitative measurement [of the entire composite] could yield values less than detection limits or in such a small quantity that it would 'appear' to be well within EPA standards."

The letter concludes that "it is obvious from the above scenarios that one composite from fifteen locations can not yield analytical data that this Department could base a reasonable, accurate, and confident evaluation on this property." It recommends that ARI or CME "perform further work on this property and submit to us the minimal amount of information requested in our October 30, 1985 letter."

### 8. Memo of January 7, 1986

DHEC's Stream and Facility Monitoring department analyzed the preliminary understream sediment samples it gathered in June 1985 from the property. The results, a copy of which was sent to David Race of ARI, indicated "limited contamination" of the stream sediment at the north end of the property, and noted "elevated levels of petroleum hydrocarbons" also on the north end of the property. The memo predicts that "disturbance of the stream sediments" in these areas "would appear to present the likely release of certain heavy metals," including copper, lead and mercury. The memo also cautioned that its results were for sediments under the stream, and that no non-aquatic soil samples were taken.

### 9. Letter of January 21, 1986

Shortly thereafter, DHEC's Division of Water Quality removed Condition 9 of the water quality certification and permitted the boat rental pier to be built in the marina. This was based upon the aforementioned sampling results, which revealed no noticeable contamination on the southern end of the property. The January 21, 1986 letter informing CME of this condition removal still cautions CME of the need to do more testing: "This does not remove our concerns about possible contamination of the upland site where a campground was proposed as expressed in letters from [the Bureau]."

### 10. Letter of March 20, 1986

The Bureau sent a letter to the South Carolina Coastal Council's permit administrator on March 20, 1986 confirming that CME had withdrawn its request to obtain a permit for an RV park and campground. It reiterated the Bureau's involvement in the matter, including its suspicions that there were hazardous materials on the site, the insufficiency of Carolina Engineering's samplings, and its recommendation that "the deficiencies be corrected so that this office can complete its evaluation on the raised environmental concerns." Because construction authorization was no longer being sought from the Bureau, it indicated it no longer had involvement with any testing or monitoring of the site, including the marina.

### 11. Plaintiffs' Efforts at Financing

The plaintiffs continued with their efforts to construct Dolphin Cove Marina on the property. In order to obtain financing for the project, ARI and CME as borrowers [6] obtained a loan from Citizens and Southern National Bank. The loan was structured to be paid out in three stages, commensurate with the three phases of Dolphin Cove Marina's construction. The loan was initially granted on December 30, 1988, and was conditioned upon the Borrowers'. Affidavit that they would, among other things, "commission an environmental audit of the Property to be based upon sampling and analysis of soil, surface water and ground water, visual inspection, and other such methods as may be appropriate, using the best available technology and information and the service of competent and professional consultants with expertise in the auditing process."

The plaintiffs submitted the December 1985 Carolina Engineering/GEL report as compliance with this affidavit,[7] which re-

---

6. Guarantors on the loan were David Race, Thomas Blocker, Jr. (who also helped finance Carolina Engineering with Race), and Mictronics, Inc. (also owned by Race). ·

7. There is conflicting evidence on this point. David Race stated at deposition that this "inspection" required by the bank was satisfied by "the testing we did in '85 and '86," while Carolina Engineering employee Michael Sage

sults stated that no contamination existed on the property. However, as noted earlier, the Bureau found this sampling insufficient to base any conclusions regarding soil contamination. Likewise, the plaintiffs' environmental expert in this case, Thomas Hutto, indicated at deposition that the Carolina Engineering report was not sufficient to be used in evaluating the presence of contamination.

During the Phase II evaluation, sometime in 1996, GEL issued another environmental status report on the site, as required by new financing agent Nations-Bank.[8] This report indicated that there was significant contamination in the form of high contents of lead and arsenic. As a result of this report, the EPA and DHEC performed environmental assessments on the property and have concluded similarly. The plaintiffs brought this suit in October 1998, seeking damages for the defendants' "contamination of the property with toxic, noxious, and hazardous substances."

The defendants moved for summary judgment on May 19, 2000, pursuant to Fed.R.Civ.P. 56 and LR 7(DSC), to which the plaintiffs responded on June 9, 2000.

The defendants submitted a reply on June 19, 2000. The matter is thus ripe for decision.[9]

## Discussion

■ The defendants move for summary judgment on many issues; however, the primary issue is that the plaintiffs' suit violates the statute of limitations. As this issue affects the very existence of the plaintiffs' cause of action, the Court will address it first.

The parties agree that the statute of limitations applicable to this case is found in S.C.Code § 15-3-530(3), governing actions for trespass upon or damage to real property. This statute gives, at the most, a six-year statute of limitations.[10] More importantly, the parties also agree that "the discovery rule" applies to the accrual of this action. *Dean v. Ruscon Corp.*, 321 S.C. 360, 468 S.E.2d 645, 647 (1996) (holding that discovery rule applied to action under S.C.Code § 15-3-530(3)); *see Santee Portland Cement Co. v. Daniel Int'l Corp.*, 299 S.C. 269, 384 S.E.2d 693, 695 (1989), *overruled on other grounds, Atlas Food Sys. & Svcs. v. Crane Nat'l Vendors*, 319 S.C. 556, 462 S.E.2d 858 (1995) (citing

testified that no bank or other entity ever asked him for the results of the sampling he conducted. The Court will assume for purposes of this motion that the Carolina Engineering/GEL results were submitted to the bank.

8. This report, and the sampling procedure upon which the evaluation is based, appears nowhere in the exhibits attached to briefs for summary judgment. However, a 1997 EPA analysis of the larger area around the site is attached.

9. During the pendency of this motion, this case was transferred to the undersigned Judge after the recusal of the Honorable Patrick M. Duffy. After said transfer, the defendants submitted a supplemental memorandum in support of their motion on July 28,

2000, to which the plaintiffs responded on August 1. However, the Court finds that the matter is too close to trial to consider additional information not originally submitted with the motion. Moreover, LR 7(DSC) does not provide for the filing of supplemental memoranda, and the defendants did not move for leave to file same. In any event, a cursory review of the memoranda reveals that the materials therein do little if anything to alter the Court's perception of the issues in dispute.

10. For causes of action accruing prior to April 5, 1988, the statute of limitations was six years. For causes of action accruing thereafter, the period is three years. The parties stipulate that, because of the defendants' arguments regarding the date of the accrual, there is no need to determine which of these periods should control.

*Campus Sweater & Sportswear v. M.B. Kahn Constr.,* 515 F.Supp. 64 (D.S.C. 1979)).

> According to the discovery rule, the statute of limitations begins to run when a cause of action reasonably ought to have been discovered. The statute runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct.

*Dean v. Ruscon Corp.,* 468 S.E.2d at 647; *see Republic Contracting Corp. v. South Carolina Dep't of Hwys. & Pub. Transp.,* 332 S.C. 197, 503 S.E.2d 761, 766–67 (Ct. App.1998) (same); *Dorman v. Campbell,* 331 S.C. 179, 500 S.E.2d 786, 789 (Ct.App. 1998) (same).

The "exercise of reasonable diligence" has been interpreted to mean that "the injured party must act with some promptness where the facts and circumstances of an injury place a reasonable person of common knowledge and experience on notice that a claim against another party might exist." *Id.* (citing *Snell v. Columbia Gun Exch., Inc.,* 276 S.C. 301, 278 S.E.2d 333 (1981)). "Moreover, the fact that the injured party may not comprehend the full extent of the damage is immaterial." *Id.* (citing *Dillon County Sch. Dist. v. Lewis Sheet Metal Works,* 286 S.C. 207, 332 S.E.2d 555 (Ct.App.1985), *cert. dismissed,* 288 S.C. 468, 343 S.E.2d 613 (1986)); *see Dorman v. Campbell,* 500 S.E.2d at 789 (same).

Assuming for the benefit of the plaintiffs that they had no *actual* knowledge that a cause of action existed, the crux of the inquiry in this case is when the plaintiffs had enough information such that it should have acted promptly to determine whether a cause of action might exist against the defendants for the injuries claimed in this case. After reviewing the record and considering the evidence in the light most favorable to the plaintiffs, the Court finds that this occurred *at the latest* in 1986.

The above-quoted documents from various DHEC agencies clearly indicate as early as July 1985 that there were questions about contamination on the plaintiffs' land, or at least on land nearby. The July 18, 1985 letter, mailed to CME, plainly states that land surrounding the plaintiffs' property was the site of "heavy industry" for many years, that there was contaminated soil upstream of the site, and that the creek adjacent to the swamp had characteristics indicating "a high potential for contamination." This information should have, at the very least, raised some questions about the possibility of contamination on the plaintiffs' land as well, since it was formerly part of the land owned by the defendant and used for industry.

Giving the plaintiffs the benefit of the doubt regarding the first letter of September 4, 1985 regarding water quality, the second letter of this date notes plainly that DHEC officials told CME personnel *directly* about the "potential for hazardous wastes in soil on your site." It is difficult to imagine more plain, direct language giving rise to at least a reasonable suspicion that a cause of action might exist, and that more investigation into the issue of contamination should be conducted. The letter goes so far as to give suggestions of what the plaintiffs should do in order to verify whether contamination actually existed on the property. It cannot be reasonably argued that a concern letter from DHEC, whose job it is to investigate and protect contamination sites, would not spur a reasonable person to look further into the matter to see whether the property has been damaged.

Nor can there be any dispute as to whether the plaintiffs knew who may have caused the damage. Rather than take it

upon themselves to verify or discredit DHEC's concerns, the plaintiffs wrote a hotly-worded, thinly-veiled threat letter to the defendants two days later, informing them that if the situation turned out to be as bad as it seemed, there would be "millions of dollars" in lawsuits. The letter identifies the problem specifically as "concerns about possible contamination and hazardous waste" on the property, and notes that the defendants previously owned the property leased by CME and owned by ARI.

This letter in and of itself is irrefutable evidence that the plaintiffs had sufficient information that they may have a claim for property damage against the defendants. It states that DHEC's second September 4 letter "raises serious questions about contamination in and around the property," and terms the potential damage as another "love canal." This letter is the notice-equivalent of a "smoking gun." It is an admission by the plaintiffs that they knew about potential contamination on their property and were concerned enough about same to inform the former property owner of these concerns and to threaten suit.

The plaintiffs' only argument against their potential knowledge of a claim is that the correspondence from DHEC "always discuss the *potential* for hazardous waste" on the property, rather than actual contamination. This argument is fatally frail. First, the discovery rule does not require actual notice of anything, or knowledge of the full extent of the damage. *Dean v. Ruscon Corp.*, 468 S.E.2d at 647. It requires a party to act promptly to investigate the existence of a claim where "the facts and circumstances" indicate that a claim "might exist." *Id.*

Second, the facts demonstrate that the plaintiffs' efforts at discovering a problem were wholly insufficient. DHEC's investi-gation of this "potential" contamination was hampered by its busy schedule. The letter of October 30, 1985 states that the Bureau could not conduct soil sampling until at least December of that year, and suggested that the plaintiffs conduct their own sampling, under guidelines and parameters set forth by DHEC. This sampling was performed by an entity organized by ARI's David Race, which had never before nor again since performed such testing. The sampling turned out to be insufficient because the individual samples were combined into only one testing sample, which could have skewed the results, as the letter of December 13, 1985 describes. More importantly, even after being informed of this insufficiency, the plaintiffs did not perform any other testing on the site and even submitted the insufficient-sample results as proof of their environmental compliance in order to obtain financing some three years later.

Based on the insufficient nature of the results, the plaintiffs' arguments that its own sampling "found no contamination in excess of EPA standards," and could not have put them on notice of a potential claim, is highly suspect, as is the plaintiffs' continuing argument that any elevated contaminants were found on *adjacent* properties and not on the property in question. Any reasonable person told that toxic wastes may have contaminated adjacent property would undertake to determine whether his or her property was similarly contaminated, especially where the state regulatory department (DHEC) took the time to give notice of this very possibility.

Moreover, though the January 7, 1986 letter from DHEC advises the plaintiffs about the positive results of the June 1985 *understream sediment* (water quality) testing, it also specifically notes that the contamination levels "do not address any

non-aquatic sediment/soil quality." Thus, the fact that the plaintiffs were eventually given a water permit by DHEC for the south end of the property does not excuse the plaintiffs from knowledge of DHEC's specific warnings in the letter of January 21, 1986 regarding "possible contamination of the upland site," or of the statements in DHEC's letter of March 20, 1986 where it reiterated the insufficiency of the plaintiffs' testing and recommended yet again that the deficiencies be corrected "so that this office can complete its evaluation on the raised environmental concerns."

In sum, the documents submitted in this case reveal that the plaintiffs clearly had notice as early as July 1985 that there may be some contamination on the adjacent properties, and later that their own site may be contaminated. They were further informed on several occasions in specific language that testing on their property should be conducted, and that the testing performed by the plaintiffs was insufficient to reasonably form an opinion regarding contamination. Information in their possession *12 years* before filing this action was commenced would have placed any reasonable person on notice that a claim against these specific defendants might exist for property damage due to contamination. *See Dean v. Ruscon Corp.*, 468 S.E.2d at 647. This notice clearly and unambiguously satisfies the requirements of the discovery rule that the plaintiffs "should have known by the exercise of reasonable diligence that a cause of action" existed against the defendants. *Id.* The plaintiffs were under an obligation to make a reasonable inquiry into the matter, which they did not make. *Id.*

■ ·Finally, there is no question of fact to be decided in this case, because the only reasonable conclusion supported by the evidence is that the plaintiffs were on notice of a potential claim as early as January 1986. *See Dean v. Ruscon Corp.*, 468 S.E.2d at 648 ("there was no question of fact for the jury to decide because the only reasonable conclusion supported by the evidence is that Dean's lawsuit accrued in November 1984, and by filing her lawsuit in April 1991, she was barred by the six year statute of limitations"); *Perry Eng'g Co. v. AT & T Communications, Inc.*, 998 F.2d 1010, 1993 WL 264461, at *5 (4th Cir. July 13, 1993) ("issues such as reasonableness and negligence normally reserved to a jury may be resolved as a matter of law where only one conclusion may reasonably be drawn from the evidence") (citing *Flying Diamond Corp. v. Pennaluna & Co.*, 586 F.2d 707 (9th Cir.1978)).[11] *See generally* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure Civil 3d § 2729 (noting that there are some instances where summary judgment may be granted in negligence actions, and citing a number of cases similar to those cited above); William L. Prosser, Law of Torts § 37 (4th ed.1971) ("evidence may be so overwhelming that no reasonable man could fail to accept the fact as proved" and the court must remove that fact from the jury); . F.P. Hubbard & R.L. Felix, The South Carolina Law of Torts 60 (2d ed.1997) (noting that the reasonableness of conduct is generally a question of fact, "except where a reasonable juror could reach only one conclusion").

Construing the evidence in the light most favorable to the plaintiffs, the latest time which they should have become aware

---

**11.** Though this is an unpublished case, it is the only Fourth Circuit case this Court could find specifically noting that summary judgment may be granted in negligence cases where a reasonable juror could reach "only one conclusion" from the evidence presented. *See* 4th Circuit Local Rule 36(c).

of the potential existence of an action is March 20, 1986. The plaintiffs did not file their action within six years of this date, and therefore their cause of action for contamination on the site is barred by the statute of limitations. Therefore, the defendant's motion for summary judgment is granted on these grounds,[12] and the plaintiffs' action is dismissed.

**AND IT IS SO ORDERED.**

12. Because the Court grants the motion on this basis, it does not need to decide the merits of the defendant's remaining arguments for summary judgment.