**UNITED STATES COURT OF APPEALS**

**TENCH CIRCUIT**

B.S.C. HOLDING, INC. and LYONS
SALT COMPANY,

        Plaintiffs-Appellants,

v.

LEXINGTON INSURANCE
COMPANY,

        Defendant-Appellee.

No. 14-3130
(D.C. No. 2:11-CV-02252-EFM)
(D. of Kan.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, **EBEL**, and **GORSUCH**, Circuit Judges.

B.S.C. Holding and Lyons Salt Company (collectively BSC) appeal the

district court's dismissal of their claims against Lexington Insurance, the insurer

of the Lyons Salt Mine. The Lyons Salt Mine is a Kansas facility that

experienced a large inflow of water beginning in 2008, which was eventually

attributed to an abandoned surface gas well.

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

BSC argues that the district court erred in dismissing its case based on an insurance policy provision requiring all suits be commenced within twelve months of the discovery of the underlying loss or series of losses. It argues that the district court made two errors in reaching its conclusion. First, BSC contends that Kansas law prohibits the enforcement of suit-limitation provisions unless the insurer can show it was prejudiced by the plaintiff's failure to file a timely suit. Although Kansas applies a prejudice requirement when plaintiffs fail to comply with notice-of-loss provisions, we decline to extend the prejudice requirement to cases involving suit-limitation provisions.

Second, BSC argues the district court erred in finding the limitation period expired before it brought its suit. BSC contends that the limitation period should not have begun until it understood the causes that led to the flooding of the mine. Under the provisions of the insurance policy, BSC had an obligation to bring suit within twelve months of any event leading to direct physical loss. Although there may be cases where a plaintiff needs to know the cause of seemingly uncovered damage in order to discover that he may be dealing with a covered loss, this is not such a case.

Exercising jurisdiction under 28 U.S.C. 1291, we AFFIRM.

# I. Background

BSC Holding is the sole shareholder of Lyons Salt Company, the operator of the Lyons Salt Mine. Beginning in 2002, BSC purchased from Lexington Insurance a series of annual all-risk insurance policies covering the property.

In late 2004, BSC first learned of problems with the mine. At that time, it discovered the space between the floor and ceiling in a section of the mine was contracting at an abnormally high rate. The problem reoccurred again in April of 2005 and again a few months after that. In September 2005, a consultant informed BSC that water may enter the mine due to the abnormal closure rates and that this could be a "huge problem." App., Vol. 6 at 1489. By December 2006, one portion of the mine had closed from an original height of 16.5 feet to 4.5 feet. At this point BSC began considering a number of remedies, including construction of an underground bulkhead to seal off the area. They also began performing backfilling in the area.

In January 2008, BSC discovered a water leak of twenty-two gallons per minute in the section of the mine where closure had occurred. Unsure as to the cause, BSC retained outside mining experts to investigate the situation. Although the experts initially believed the problem to be naturally occurring, they ultimately concluded in April 2010 that an improperly sealed well had caused a deformation in the rock above the mine, which in turn created a path between the mine and an aquifer. Because of the nature of the problem, the panel further

-3-

concluded the flooding could not be stopped and that, eventually, the roof of the mine would collapse, flooding the entire mine and destroying structures on the surface above.

BSC finally informed Lexington of the leak in May 2010 and made a claim against its policy, requesting compensation for the expenses it had incurred in attempting to diagnose and remedy the situation. In October 2010, Lexington sent a response letter. In the letter, Lexington acknowledged the claim and reminded BSC that it was "required to take steps to minimize the exposure and risk associated with this loss." App., Vol. 7 at 1940.

Lexington made no further response to BSC's request for reimbursement, and BSC filed suit in May 2011. In 2013, the district court granted summary judgment to Lexington on the grounds that BSC had not complied with a policy provision requiring it to provide Lexington with notice of its loss "as soon as practicable." *B.S.C. Holding, Inc. v. Lexington Ins. Co.* (*B.S.C. I*), 559 F. App'x 663, 665 (10th Cir. 2014). We reversed, holding that an insured's failure to comply with such notice-of-loss provisions does not bar suit unless the insurer demonstrates it was prejudiced by the delay.

On remand, the district court again granted Lexington summary judgment and dismissed all of BSC's claims. Specifically, the court found that the case was time-barred by the suit-limitation provision in the insurance policy. The district court found that BSC discovered the occurrence—or loss—giving rise to the claim

no later than January 18, 2008, the day water first entered the mine in large quantities. Because BSC did not file its suit until forty-one months later, the court found the suit barred by the limitation provision. In the alternative, the court found the mine was not covered under the policies in the first place because they covered neither "land" nor "property situated underground." App., Vol. 6 at 2310.

## II. Analysis

BSC contends the district court erred in applying the insurance policy's twelve-month suit-limitation provision.[1] It first argues the limitation provision is unenforceable under Kansas law as a matter of public policy. Second, even if the provision was not violative of Kansas law, BSC also argues that the clock on the twelve-month limitation period should not have started until April 2010, when its investigative team discovered the cause of the leak.

We review a grant of summary judgment de novo, applying the same standards used by the district court. *Pittman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1295 (10th Cir. 2000). "As a federal court sitting in diversity of citizenship litigation, our duty under *Erie v. Tompkins* . . . is of course to conform to [Kansas's] substantive law." *Stauth v. Nat'l Union Fire Ins.*

---

[1] BSC also challenges the district court's alternative holding that the Lexington policy did not cover either the mine or its contents. Because we find this suit was barred by the policy's limitation provision, we do not address this issue.

*of Pittsburgh. Pa.*, 236 F.3d 1260, 1267 (10th Cir. 2001). In the absence of definitive direction from the Kansas Supreme Court, we must "predict the course that body would take if confronted with the issue." *Id.*

### A. Public Policy

BSC first argues we need not issue an interpretation of the policy language at all. Instead, it maintains the one-year suit-limitation provision is unenforceable because it violates Kansas public policy. BSC contends Kansas law disfavors the forfeiture of insurance benefits unless an insured's failure to comply with a contractual provision substantially prejudices the insurer. Although it acknowledges that the Kansas courts have not applied this rule to suit-limitation provisions, BSC says the prejudice requirement has been consistently applied to similar provisions and thus should apply here.

Suit limitation provisions are not per se invalid under Kansas law. In *Pfeifer v. Federal Express Corp.*, 304 P.3d 1226, 1231 (Kan. 2013), the Kansas Supreme Court rejected the argument that Kansas statutory law prohibits contractual shortening of limitations periods. *Id.* Even so, the court struck down the six-month contractual limitation period at issue, finding it conflicted with Kansas's "policy of protecting injured workers from retaliation for exercising their statutory rights under the Workers Compensation Act." *Id.* Because it was also concerned with the freedom of parties to contract, *id.* at 1230, the court

-6-

limited its holding to "circumstances in which there is a strongly held public policy interest at issue," *id.* at 1234.

BSC contends similar public policy objections apply to the one-year provision here. It points to *Cessna Aircraft Co. v. Hartford Accident & Indemnity Co.*, 900 F. Supp. 1489, 1518 n.38 (D. Kan. 1995), for the proposition that Kansas public policy disfavors forfeitures of insurance benefits which would result in a windfall to the insurer. But as *Cessna* itself noted, "[f]orfeitures of insurance policies" are permitted "when expressed in clear and unmistakable terms." *Id.* The language in the suit-limitation provision here is unmistakably clear: "No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months . . . ." App., Vol. 1 at 58.

Although the limitation provision complies with Cessna's clear statement rule, BSC argues that because Kansas disfavors insurance forfeiture as a general matter, we should only enforce the provision if Lexington can show prejudice from the delay. As BSC asserts, an insured's failure to timely comply with a notice- or proof-of-loss provision will not bar suit under Kansas law unless the insurer can show substantial prejudice from the delay.[2] *See, e.g.*, *B.S.C. I*, 559 F.

_____

[2] Notice-of-loss provisions generally require the insured to inform the insurer of potential losses within a set time period of the event. *See* 13 Couch on Insurance § 186:1 (3d ed. 2014). Proof-of-loss provisions are similar, but generally require additional detail concerning the loss. *See id.*

App'x at 665. BSC argues there is no reason to distinguish suit-limitation provisions from notice- and proof-of-loss provisions—that is, because Kansas law protects insureds who fail to give timely notice or proof of their claims, it should also excuse those who fail to file timely suit, unless the insurer can show prejudice from the delay.

We disagree. Although notice-of-loss and suit-limitation provisions may share some superficial similarities, their purposes are quite different. "'The fundamental purpose [of notice-of-loss provisions] is that prompt notice will afford the carrier an opportunity to investigate the occurrence and thereafter properly dispose of any claim through settlement or defense . . . . In other words, the purpose for the notice requirement is to protect the insurance carrier from having its interests prejudiced.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. F.D.I.C.*, 957 P.2d 357, 367 (Kan. 1998) (quoting *Travelers Ins. Co. v. Feld Car & Truck Leasing Corp.*, 517 F. Supp. 1132, 1135 (D. Kan. 1981)). Thus, "'when an insurance carrier's interests have not been materially prejudiced because of late notice, the purpose for the notice requirement is nonexistent'" and it would "'be neither fair nor logical for an insurance carrier to avoid responsibility when its interests have not been prejudiced by late notice.'" *Id.* (quoting *Travelers Ins. Co.*, 517 F. Supp. at 1135).

In contrast, the purposes underlying suit-limitation provisions are much broader. Like all statutes of limitation, "[t]hey enable an insurer to fix its present

and future liabilities and to close stale claim files." *Herman v. Valley Ins. Co.*, 928 P.2d 985, 990–91 (Or. Ct. App. 1996). Furthermore, they "encourage plaintiffs to use reasonable and proper diligence in enforcing their rights" and protect courts from having to resolve claims years after the fact. *Zieba v. Middlesex Mut. Assurance Co.*, 549 F. Supp. 1318, 1321 (D. Conn. 1982). In short, suit-limitation provisions serve a number of purposes even when the insurer is not directly prejudiced by a late filing.

Consequently, most courts have found that suit-limitation provisions, unlike notice- or proof-of-loss provisions, should be enforced even in the absence of prejudice. Although a majority of jurisdictions require an insurer show prejudice to enforce a notice-of-loss provision, *see* 16 Couch on Insurance § 193:1, most do not require an insurer show prejudice to enforce a suit-limitation provision, *e.g.*, *Hosp. Support Servs., Ltd. v. Kemper Grp., Inc.*, 889 F.2d 1311, 1316 (3d Cir. 1989); *Zieba*, 549 F. Supp. at 1321; *Brandywine One Hundred Corp. v. Hartford Fire Ins. Co.*, 405 F. Supp. 147, 151 (D. Del. 1975); *L & H Transp., Inc. v. Drew Agency, Inc.*, 403 N.W.2d 223, 225–26 (Minn. 1987); *Sanchez v. Kemper Ins. Cos.*, 632 P.2d 343, 345 (N.M. 1981); *Herman*, 928 P.2d at 990–91; *Donahue v. Hartford Fire Ins. Co.*, 295 A.2d 693, 693–94 (R.I. 1972); *Brick Church Transmission, Inc. v. S. Pilot Ins. Co.*, 140 S.W.3d 324, 331–34 (Tenn. Ct. App. 2003); *Simms v. Allstate Ins. Co.*, 621 P.2d 155, 158 (Wash. Ct. App. 1980); 16 Couch on Insurance § 234:8.

We have no reason to doubt that the Kansas Supreme Court would apply the majority rule. Before adopting the notice prejudice requirement in *National Union Fire*, that court expressly and repeatedly considered the fact that, absent prejudice, proof-of-loss provisions serve no legitimate purpose. *See* 957 P.2d at 741, 743, 746, 749–50. Most importantly, however, the Kansas Supreme Court has expressed a hesitance to interfere on public policy grounds with parties' freedom to contract. As the Court has recognized, "'[T]he paramount public policy is that freedom to contract is not to be interfered with lightly.'" *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 128 (Kan. 2003) (quoting *Foltz v. Struxness*, 215 P.2d 133 (Kan. 1950)). Suit-limitation provisions serve a number of legitimate purposes which can ultimately lower costs to consumers. Given that those purposes are advanced even when the insurer is not prejudiced by a late filing, we do not believe the Kansas Supreme Court would buck the nationwide trend and alter the parties' agreement through application of a prejudice requirement.[3]

As a result, we find no error in the district court's conclusion that Kansas law would not prohibit enforcement of the suit-limitation provision. We thus turn to the insurance policy itself.

---

[3] We express no opinion as to the validity of limitation periods alleged to be unreasonably short.

### B. *Limitation Period*

Even if public policy does not prohibit application of the suit-limitation provision, BSC challenges the district court's conclusion that the twelve-month limitation period expired before it filed suit. It makes two arguments on this point.

First, BSC contends that the limitation period should have begun in April 2010 when its experts determined the cause of the water leak, and not in January 2008 when the leak first began. Because it did not file suit until May 2011—thirteen months after its proposed date and one month after the limitation period would expire—BSC also argues the clock should have been tolled for most of that period while Lexington considered its claim. We do not reach BSC's tolling argument because we agree with the district court that the limitation period commenced in 2008 and thus expired before Lexington had any knowledge of the claim.

Turning to the Lexington policy, the suit-limitation provision requires that all suits be brought within twelve months "after discovery by the Insured of the occurrence which gives rise to the claim." App., Vol. 1 at 58. The policy defines "occurrence" as "any one loss, disaster, casualty, or series of losses, disasters, or causalities arising out of one event." *Id.* at 52. It covers "all risk of direct physical loss including flood and earthquake." *Id.* at 42. Combined, these provisions establish that the limitation period begins when an insured discovers

the loss giving rise to its claim.[4]  As the district court saw it, BSC was aware of its loss when water entered the mine in substantial quantities in January 2008.

We agree with the district court.  In January 2008 BSC knew that an "event" had occurred that was introducing hundreds of thousands of gallons of water into the mine (around 30,000 gallons per day).  It was experiencing a loss consisting of both damage to the salt mine and the costs of remediation.  Nothing in the policy requires that the exact cause of the event be identified with any precision.  What is important is the infliction of "direct physical loss" or damage to the insured's property.

Even so, BSC argues that its knowledge of physical damage is not enough to establish an occurrence.  It says the limitation period cannot begin until the insured has knowledge of *both* the harm *and* the cause of the harm.  Without knowledge of the cause, it contends, an insured cannot know whether it has a *covered* loss which could give rise to a claim.

In support of this argument, BSC points to three cases from other jurisdictions, *Gaylord v. Nationwide Mutual Insurance Co.*, 776 F. Supp. 2d 1101 (E.D. Cal. 2011), *Parker v. Worcester Insurance Co.*, 247 F.3d 1 (1st Cir. 2001), and *Myers v. Cigna Property & Casualty Insurance Co.*, 953 F. Supp. 551 (S.D.N.Y. 1997).  We do not find these cases persuasive.  In *Gaylord*, the court

_____

[4]  Although the policy does not further define "loss," it is clear that BSC suffered both physical and economic damage as a result of these events.

-12-

held that a limitation period does not begin under California law until "a reasonable insured would be aware that his notification duty under the policy has been triggered."  776 F. Supp. 2d at 1114 (internal quotation marks omitted).  As a result, "[t]he more substantial or unusual the nature of the damage discovered by the insured (e.g., the greater its deviation from what a reasonable person would consider normal wear and tear), the greater the insured's duty to notify his insurer of the loss promptly and diligently."  *Id.* (internal quotation marks omitted).  Applying a similar rule, the court in *Parker* held that a limitation period did not begin to run under Connecticut law when the insured first noticed cracks in his house foundation because the cracks appeared cosmetic in nature.  247 F.3d at 4–5.  Instead, the clock began when the plaintiff discovered that those cracks represented a serious structural problem.  *Id.*  *Myers* also held that the limitations period would not run until the insured discovered the cause of his loss, 953 F. Supp. at 555–56, because the policy required the insured to prove his loss resulted from a covered cause before liability accrued, *see id.* at 553 ("A covered cause of loss must be established for the consideration of these expenses and their payment.").

As an initial matter, we do not find *Myers* to be applicable here.  To recover, Myers's policy required that he prove his loss resulted from a covered cause—naturally his limitation period could not begin until cause was established.  953 F. Supp. at 553.  BSC's policy contains no such requirement.  All-risk

-13-

policies cover losses from nearly all causes except those specifically excluded. 5-42 Appleman on Insurance § 42.02 (2015). As a result, "the all-risk insured needs to establish only that a loss occurred; the burden then shifts to the insurer to show that the loss was caused by an exception." *Id.*

Furthermore, even if we were to agree generally with the courts in *Gaylord* and *Parker*, they do not help BSC here. Neither *Gaylord* nor *Parker* held, as a general matter, that the insured needs to understand the cause of his loss to trigger the limitation period. Rather, those cases only held that knowledge of the damage was insufficient in circumstances where, without more information, the policyholders had no reason to believe a *covered* event had occurred. Without knowledge of the causes underlying their losses, they had no reason to assume they were dealing with covered losses—*Gaylord*'s policy excluded normal attrition, while *Parker*'s excluded cosmetic cracks. In short, the policyholders had no reason to be confident that an occurrence or event had happened at all.

Here, however, BSC has offered no reason why causation matters. BSC was well aware that it had substantial problems by mid-2008. The structure in a part of the mine was closing at an abnormally high rate and the leak had introduced large quantities of water in the same area. The water had the ability to further degrade the structure of the mine if left unchecked. The situation triggered a major effort to avert further damage, with BSC spending millions of

dollars to backfill the affected area and grout the rock above the mine.[5]  It is plain

the event caused substantial physical and economic losses to BSC.  This was not

latent damage like that in *Gaylord* or *Parker*—28,000,000 gallons of water were

introduced into the mine by the time notice was given.

Nonetheless, BSC argues that given the knowledge it had at that time, it

was not clear that these losses were covered under the policy.  BSC claims it

needed to understand the source of the water and the possibility of total loss of

the mine to know that it was dealing with a covered event.  But the occurrence

and loss language of the policy contain no such requirement.  BSC has not

provided any argument for why the source of the water would affect its ability to

recover under the policy.  *See also* 5-42 Appleman on Insurance § 42.02 (noting

proof of cause generally not required to recover under all-risk policies).  Nor has

it cited anything in the policy that establishes loss of the entire mine as a

precondition to coverage.  As a result, even if we adopted the rule of *Parker* and

*Gaylord* it would not apply here.  The plaintiff in each of those cases had little

---

[5]  BSC provided *Strauss v. Chubb Indemnity Insurance Co.*, 771 F.3d 1026 (7th Cir. 2014) as supplemental authority.  *Chubb* is not relevant here.  Under the Lexington policy, the limitation period expires twelve months after the discovery of the occurrence giving rise to the claim.  The date of discovery is naturally a single, set date.  In contrast, the policy in *Chubb* stated that the clock would run until "one year after the loss occurs."  *Id.* at 1035.  Because the court in *Chubb* had already determined that it was dealing with a continually occurring loss, it concluded that the clock would not expire until twelve months after the last of the damage occurred.  *Id.*  The case says nothing about the necessity of understanding the cause of a loss in order to begin the limitation period.

reason to suspect that the damages were actually symptomatic of a larger, covered occurrence.

As a result, we agree with the district court that BSC was aware of an occurrence giving rise to a claim when water began entering the mine in January 2008.   The twelve-month limitation period thus expired in early 2009, over two years before BSC brought its claim to Lexington and more than three years before it filed this lawsuit.  Therefore, we find no error in the district court's determination that this action was barred by the policy's suit-limitation provision.

## III.  Conclusion

The district court's order dismissing the complaint is AFFIRMED[6].

ENTERED FOR THE COURT

Timothy M. Tymkovich
Circuit Judge

---

[6]  Appellants' Motion to File Exhibit to Pleading Contained in Appendix Under Seal is granted.