# United States Court of Appeals
## For the First Circuit

No. 18-1881

EASTHAMPTON CONGREGATIONAL CHURCH,

Plaintiff, Appellee,

v.

CHURCH MUTUAL INSURANCE COMPANY,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Katherine A. Robertson, Magistrate Judge]


Before

Lynch, Circuit Judge,
Souter, Associate Justice,*
and Stahl, Circuit Judge.


John Egan, with whom Rubin and Rudman, LLP was on brief, for appellant.
William P. Rose, with whom Melick & Porter LLP was on brief, for appellee.


February 22, 2019


---

*  Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL**, **Circuit Judge**.   This appeal requires the interpretation of words and terms in an insurance policy. Plaintiff-Appellee Easthampton Congregational Church (the "Church") had a property insurance policy (the "Policy") with Defendant-Appellant Church Mutual Insurance Company (the "Insurance Company").   On April 25, 2016, the ceiling in one section of the Church collapsed.  The Church filed a claim pursuant to the Policy, which the Insurance Company denied.   The Church then filed suit, seeking a declaratory judgment that the claim was covered.  On cross-motions for summary judgment, the district court ruled for the Church.   Noting that the Policy did not define the word "decay," the court adopted a dictionary definition of the word and used that definition to conclude that the Policy provided coverage.   We affirm, albeit for different reasons.

### I.   Factual Background

### A.   The Insurance Policy

The Policy was in effect at the time of the collapse and carries a coverage limit of $5,353,000.   The parties agree that the damaged section of the Church, Fellowship Hall, "is among the [covered] premises described in the [P]olicy's Declarations Page."

The coverage provisions are governed by two primary forms.  The first is the "Building and Personal Property Coverage Form," which covers "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of

- 2 -

Loss."  The second is the "Causes of Loss - Special Form."  That form sets forth various exclusions and limitations in Sections B and C, respectively.

The Insurance Company argues that two exclusionary clauses are relevant to this case.  First, in Section B-2(d), the Policy includes a "Wear and Tear Exclusion" which states:

> We will not pay for loss or damage caused by or resulting from any of the following:
>
> . . .
>
> d.   (1)  Wear and tear;
>      (2)  Rust, or other corrosion, decay, deterioration, hidden or latent defect, or any quality in property that causes it to damage or destroy itself;[1]

Second, in Section B-3(c), the Policy includes a "Faulty Construction Exclusion" which excludes coverage for:

> loss or damage caused by or resulting from any of the following [sections] but if an excluded cause of loss that is listed in [the following sections] results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> . . .
>
> c.   Faulty, inadequate, or defective:
>
> . . .

---

[1] The Insurance Company did not cite the exclusions for "wear and tear" and for "any quality in property that causes it to damage or destroy itself" in its letters to the Church denying coverage, though it did raise them before the district court.

> (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>
> (3) Materials used in repair, construction, renovation, or remodeling; or
>
> (4) Maintenance;
>
> of part or all of any property on or off the described premises.

In Section B-2(j), the Policy also includes a "Collapse Exclusion" which excludes coverage for:

> Collapse, except as provided below in the Additional Coverage - Collapse [provision]. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

The Additional Coverage - Collapse provision, Section D-2, in turn states:

> The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in [the sections] below.
>
> 1. With respect to buildings:
>
>    a. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;
>
>    . . .
>
> 2. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a [Covered Property] . . . if the collapse is caused by one or more of the following:

- 4 -

. . .

     b.    Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

. . .

     f.    Use of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling, or renovation. However, if the collapse occurs after construction, remodeling, or renovation is complete and is caused in part by a cause of loss listed in [the previous sections]; we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling, or renovation, contributes to the collapse.

Therefore, although Section B-2(j) excludes coverage for collapses generally, Section D-2 effectively reinstates coverage under limited circumstances, including where the collapse was caused in part by "[d]ecay that is hidden from view."  It is noted that the Policy does not define the word "decay."

### B.    The Ceiling Collapse

On April 25, 2016, the ceiling in the Fellowship section of the Church fell to the floor.  The Church promptly reported the incident to the Insurance Company.  Eight days later, at the request of the Insurance Company, forensic engineer Joseph Malo

inspected the ceiling collapse and detailed his findings in a written report. The parties accepted the contents of Malo's report as "agreed material facts."

In that report, Malo wrote that the ceiling "consist[ed] of three different types of materials installed one over the other with a total thickness of approximately 3 [and] 3/4 inches." "The original ceiling [was] constructed with wood lath and plaster attached to boards" spaced twelve inches apart. The boards themselves "were attached to the ceiling joists" by "cut nails with approximately 1 [and] 3/4-inch penetration." Although the boards were nailed to the joists, the wood lath and plaster were attached only to the boards. Sometime after the original ceiling was constructed, two more ceiling layers were installed. The second layer consisted of drywall affixed to boards, which were then nailed directly into the plaster. The third layer consisted of ceiling tiles that were attached directly to the surface of the drywall. Neither the second nor third layers were attached to the ceiling joists. In addition, there was approximately ten inches of insulation blown into the space above the ceiling. Therefore, the only support for the three layers of ceiling materials and insulation was the original nails that fastened the first layer of boards to the ceiling joists.

Malo concluded that "nail withdrawal" by the smooth nails used to secure the original boards to the joists caused the

ceiling collapse. He observed that "cyclical volumetric changes induce[d] by normal temperature and moisture changes in the building materials" had caused the nails' connection to the joists to weaken. Eventually, the nails completely pulled out, "leaving only holes in the bottoms of the ceiling joists." In other words, the collapse was caused by the "progressive failure of the fasteners used to attach the layers of ceiling to the ceiling joists due to the weight of the ceiling."

### C. Denial of Coverage

On May 19, 2016, the Insurance Company denied the Church's claim, relying on Malo's report. As relevant here, the Insurance Coverage cited the Faulty Construction Exclusion, stating that "[t]he fasteners used to uphold the ceiling were inadequate for the size/weight of the ceiling, and the ceiling system was not adequately fastened to the structure." The Church asked the Insurance Company to reconsider its decision, arguing that the collapse was covered under the Additional Coverage - Collapse provision. However, on July 1, 2016, the Insurance Company denied the reconsideration request.

On September 26, 2016, the Church, through counsel, sent the Insurance Company a letter detailing its position that the loss caused by the ceiling collapse was a covered event under the Policy. The Church disputed the application of the Faulty Construction Exclusion, claiming that because the ceiling lasted

approximately sixty years, its construction was "entirely effective." In addition, the Church argued that the collapse was caused by hidden decay and so was covered by the Additional Coverage - Collapse provision. It noted that Malo's report concluded that the collapse occurred because of nail withdrawal, which was a "progressive failure" that "could have taken a period of years to occur."

The Insurance Company replied by letter through counsel on October 21, 2016, reiterating its prior position that the collapse occurred because of "faulty construction." Specifically, it argued that Malo's report concluded that the ceiling's construction was flawed because the second and third layers were not securely fastened to the ceiling joists. The letter also rejected the Church's allegation that hidden decay contributed to the collapse.

## II. Procedural Background

The Church filed suit in Massachusetts Superior Court in April 2017 seeking a declaratory judgment that the Policy provided coverage for the collapse. The Insurance Company timely removed the case to federal court based on diversity jurisdiction.[2] Both

---

[2] The Church is an organization located in Easthampton, Massachusetts; the Insurance Company is a corporation with its principal place of business in Merrill, Wisconsin; and the amount in controversy exceeds $75,000.

parties consented to have the case heard by a magistrate judge and filed cross-motions for summary judgment.

On May 10, 2018, the district court granted summary judgment for the Church. Easthampton Congregational Church v. Church Mut. Ins. Co., 322 F. Supp. 3d 230 (D. Mass. 2018). The court concluded that the collapse resulted at least in part from "hidden decay" such that the Additional Coverage - Collapse provision applied. Id. at 235-41. After noting that the Policy failed to define "decay," the court looked to dictionary definitions of that term and adopted a definition that encompassed "a gradual deterioration or decline in strength or soundness." Id. at 236-37. From there, the court held that there was sufficient evidence (i.e., the Malo report) to show that the collapse "was 'caused in part' by 'decay'" "hidden from view" -- namely, the gradual nail withdrawal. Id. at 236-38. Accordingly, it held that the collapse fell within the Additional Coverage - Collapse provision. Id. Because that provision expressly provided coverage, the court declined to address the Insurance Company's arguments that the Wear and Tear and Faulty Construction Exclusions applied. Id. at 241-42. This timely appeal followed.

**III. Analysis**

**A.   Legal Framework**

We review the district court's grant of summary judgment de novo. AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3

(1st Cir. 2015). "Cross motions [for summary judgment] simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004) (quotation marks and citation omitted).

"Because this case is brought in diversity jurisdiction, we must look to state law for the substantive rules of decision." Sanders v. Phoenix Ins. Co., 843 F.3d 37, 42 (1st Cir. 2016) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). The parties agree that Massachusetts law controls the disposition of this case. See Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011) ("In determining which state's law applies, a diversity court is free to honor the parties' reasonable agreement.").

"[T]he construction of an insurance policy is a question of law . . . ." Lind-Hernández v. Hosp. Episcopal San Lucas Guayama, 898 F.3d 99, 103 (1st Cir. 2018) (internal quotation marks and citation omitted). "Under Massachusetts law, we construe an insurance policy under the general rules of contract interpretation, beginning with the actual language of the policies, given its plain and ordinary meaning." AIG Prop. Cas. Co. v. Cosby, 892 F.3d 25, 27 (1st Cir. 2018) (internal quotation marks, alterations, and citation omitted).

As a general matter, in Massachusetts, the insured bears the "initial burden of showing that the case involves a generally

covered risk under the policy."  Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 247 (1st Cir. 2013) (citation omitted). Where, as is here, the parties do not dispute that the incident was a generally covered risk, the burden shifts such that the insurer must demonstrate that an exclusion precludes coverage. Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins. Co., 734 F.3d 51, 55 & n.1 (1st Cir. 2013).  "And if the insurer satisfies that burden, the burden shifts back to the insureds to show an exception to the exclusion holds sway."  Stor/Gard, Inc., 717 F.3d at 247 (citation omitted).

However, where "a term is 'susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one,' the term is ambiguous."  U.S. Liab. Ins. Co. v. Benchmark Constr. Servs., Inc., 797 F.3d 116, 119-20 (1st Cir. 2015) (quoting Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998)).  To the extent an ambiguity does exist, it is strictly construed against the insurer.  See Metro. Prop. & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 362-63 (2011).

It is also a principle of Massachusetts law that "[m]ore specific contract terms ordinarily control over more general contract terms."  Davis v. Dawson, Inc., 15 F. Supp. 2d 64, 109 (D. Mass. 1998) (citing Lawson v. Fed. Deposit Ins. Corp., 3 F.3d 11, 17 (1st Cir. 1993)).  Therefore, if a policy provision is found

- 11 -

to provide for coverage, then general exclusion clauses are inapplicable. See id.

## B. Definition of "Decay"

The parties agree that we must first determine whether the hidden decay section of the Additional Coverage - Collapse provision applies. If the ceiling collapse is covered by that section, or if the language is ambiguous with respect to coverage, then the general Faulty Construction and Wear and Tear Exclusions are inapplicable. The parties further agree that the nail withdrawal was "hidden," so that the disposition of this case turns at the outset on the definition and application of the word "decay."

As we have said, the Policy does not define "decay." In such circumstances, "courts often look to dictionaries for assistance in determining ordinary meaning." Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491, 498-99 (1st Cir. 2005) (citation omitted). Here, the district court consulted two dictionaries. Easthampton, 322 F. Supp. 3d at 236. First, it looked to the Merriam-Webster Dictionary, which defined "decay" (in noun form) as a "gradual decline in strength, soundness, or prosperity or in degree of excellence or perfection," "a wasting or wearing away," and a "rot . . . specifically[,] aerobic decomposition of proteins chiefly by bacteria." Decay, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/decay.

Second, it turned to the Oxford English Dictionary, which defined "decay" as "[t]he process of falling off from a prosperous or thriving condition; progressive decline; the condition of one who has thus fallen off or declined," "falling off (in quantity, volume, intensity, etc.); dwindling, decrease," and "the destructive decomposition or wasting of organic tissue; rotting." Decay, Oxford English Dictionary, available at http://www.oed.com/view/Entry/48067?rskey=z7ljDr& result=1#eid.

The district court held that "[t]he most reasonable reading of the word 'decay' as it is used in the Policy is that it refers to the broader concept of the word." Easthampton, 322 F. Supp. 3d at 236. That is, a "gradual decline in strength" or "progressive decline" as opposed to a narrower definition that entails organic rotting. Id. at 236-37. In support, it noted that the Policy used the word "rot" in a separate exclusion titled "'Fungus,' Wet Rot, Dry Rot and Bacteria." Id. at 236. Therefore, the district court reasoned that the Insurance Company must have intended "decay" to mean something broader than rot. Id. at 236-37.

We agree with the district court's decision, although not its reasoning. As used in the Policy, the word "decay" could plausibly be read to mean either "progressive decline" or "rot." Accordingly, its meaning is ambiguous and that ambiguity must be

resolved in the Church's favor.[3]  See U.S. Liab. Ins. Co., 797 F.3d at 119-21; Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 449 Mass. 621, 628 (2007).  On that basis alone, we affirm the district court's judgment.

We note that other courts have resolved this issue in the same way.  For example, in Stamm Theatres, Inc. v. Hartford Cas. Ins. Co., 93 Cal. App. 4th 531, 535 (2001), the ceiling in the insured's theater "was in a state of 'imminent collapse.'" Several wooden trusses supporting the ceiling had cracked "completely through."  Id. at 536.  The theater produced an expert who attributed the cracks to, inter alia, "the increased load created by a partial reroofing."  Id.  The insurer produced experts who similarly concluded that the cracks were caused by excessive pressure on the trusses.  Id. at 537.  Considering an insurance policy that, like the Policy in question here, covered losses attributable to "hidden decay," the California Court of Appeals rejected the insurer's argument that the definition of "decay" should be limited to organic rot.  Id. at 538-41.  In doing so, the court stated that the insurer's failure to define "decay," coupled with the existence of multiple dictionary definitions of

---

[3] Neither party argued that the term was ambiguous at the district court.  However, on appeal, the Church appears to have raised an ambiguity argument.

the term, created an ambiguity that must be resolved in favor of the insured.[4]  Id. at 543.

The Insurance Company raises a variety of arguments in response, none of which are availing.  First, it suggests that the cases the district court relied upon were inapposite because the "'decay' that was the actual subject of each [case] was uniformly, and more narrowly, associated with a discrete physical impairment to the material quality of a component of the collapsed property."  However, that argument does nothing to refute the core holding of the cited cases -- namely, that those "physical impairments" were covered because they fell within a broader definition of "decay" that included gradual degradation.

---

[4]  It is also a principle that contract terms should be construed in their plain and ordinary meaning.  AIG Prop. Cas. Co., 892 F.3d at 27.  While "decay" has a definition connoting "rot" in the biological sciences, other courts have found that its "'ordinary, plain meaning' [] encompasses a 'generalized definition of decomposition.'"  Joy Tabernacle—The New Testament Church v. State Farm Fire and Cas. Co., 616 F. App'x 802, 809 (6th Cir. 2015) (unpublished) (quoting Hani & Ramiz, Inc. v. North Pointe Ins. Co., No. 316453, 2014 WL 523492, at *3 (Mich. Ct. App. Feb. 4, 2014) (unpublished per curiam opinion)); accord Quality Time, Inc. v. West Bend Mut. Ins. Co., No. 12-1008-JTM, 2013 WL 474289, at *13 (D. Kan. Feb. 7, 2013) ("Because the term decay may, consistent with popular understanding, be construed to mean gradual deterioration or degradation, without organic decomposition, this is how the court construes the term here."); Ne. Ctr. Inc. v. St. Paul Fire and Marine Ins. Co., No. 03-246-TS, 2006 WL 842396, at *5 (N.D. Ind. Mar. 28, 2006) (concluding that "decay" "is not ordinarily understood to mean only 'rot,'" but rather connotes "a progressive failure in strength or soundness" or "wasting and wearing away.").

Second, the Insurance Company complains that the district court's chosen definition would encompass all collapses, because "it is difficult to imagine any collapse, of any structure, being caused by something other than 'decay.'" But, even if the Insurance Company did not intend to provide coverage for collapses like the one in question, that is a self-inflicted problem. The Insurance Company, which wrote the Policy, could simply have defined "decay" narrowly or limited the coverage period. Despite the Insurance Company's protestations, our interpretation of the Policy would not result in coverage for all collapses. As the district court correctly noted, "[t]he insured still has to prove that one of the . . . enumerated causes of loss contributed to the collapse, and where an insured relies on hidden decay, the insured still has to show a gradual deterioration or decline in strength or soundness that was not apparent to the insured." Easthampton, 322 F. Supp. 3d at 241.

Finally, the Insurance Company argues that the district court's decision "cannot be reconciled with [the First Circuit's] opinion in Parker v. Worcester Ins. Co., 247 F.3d 1 (1st Cir. 2001)." In that case, the plaintiff homeowner obtained homeowner's insurance shortly after acquiring her Connecticut home. Parker, 247 F.3d at 2. Soon after moving in, she noticed hairline cracks in the concrete walls of the basement but disregarded them as cosmetic. Id. Approximately ten years later, she "noticed that

- 16 -

the cracks were growing larger," threatening the home's foundation, and filed a claim for collapse with the defendant insurer.[5]  Id.  The insurer denied coverage based on an engineering report which concluded that the cracks were caused by "defective concrete" and "high lateral earth pressures due to poor drainage."  Id. at 3.

The district court granted summary judgment for the insurer, finding that the claim was time-barred.  Id. at 3-4.  This court reversed, concluding that the Connecticut Supreme Court[6] would likely toll the limitations period until "the point of real or imputed knowledge of such a threat [of loss]."  Id. at 5.  However, in dicta, the decision expressed skepticism as to the merits of the claim, cautioning that the policy excluded coverage for loss "due to faulty construction of the foundation."  Id. at 6.  While there was a coverage provision for "hidden decay," the decision also stated that "'decay' is not a backdoor to coverage for poor construction materials and workmanship."  Id.

Here, because the second and third layers of the ceiling were never fastened to the joists, the Insurance Company argues

---

[5] In Connecticut, a property owner may file a claim for collapse "as soon as structural integrity is substantially impaired."  Parker, 247 F.3d at 4 (citing Beach v. Middlesex Mut. Assurance Co., 532 A.2d 1297, 1300-01 (Conn. 1987)).

[6] In Parker, although the case was filed in Massachusetts, the parties agreed that Connecticut law controlled.  247 F.3d at 3.

that the collapse was attributable to defective workmanship and that the above-quoted dicta from Parker compels reversal. It argues that to do otherwise would be to "sneak in through the backdoor of coverage in the guise of 'hidden decay.'" In support, the Insurance Company claims that "[t]he policy language in the two [cases] is essentially the same."

Even ignoring the fact that the cited language was dicta, which is not binding, there are important distinctions between Parker and this case. In Parker, the insurer limited coverage for collapses attributable to "defective material or methods" only to situations where the collapse occurred "during construction." 247 F.3d at 6. By contrast, in this case, the Insurance Company explicitly granted coverage for collapses occurring after construction, provided the collapse was caused in part by hidden decay. Moreover, in Parker, because the concrete that caused the collapse was defective to begin with, it was doubtful that it "could be called 'decay,'" so the hidden decay provision was inapplicable. Id. at 6. Here, even assuming that the ceiling as put together at the time of collapse was defective, the Malo report establishes that the cause of the collapse was the progressive weakening of the smooth nails connecting the first layer of the ceiling to the joists. Our holding is not inconsistent with Parker.

**IV. Conclusion**

Because ambiguities in the Policy result in coverage for the collapse, we need not consider the application of the general exclusions.  For the foregoing reasons, the judgment of the district court is AFFIRMED.  Costs are awarded to the Church.